IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

INMAR BRAND SOLUTIONS, INC.,    )
                                )
            Plaintiff,           )
                                )
        v.                      )            1:18-CV-761
                                )
INFINITY SALES GROUP, LLC,      )
                                )
            Defendant.          )

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Plaintiff Inmar Brand Solutions, Inc. and defendant Infinity Sales Group, LLC entered into a contract whereby Inmar arranged for ads for Infinity's client to be printed on customer receipts issued for purchases at Dollar General Stores, and Infinity was to pay Inmar based on the number of ads printed. While there are disputed questions of material fact as to whether Infinity breached the contract at the end of March 2018, the facts viewed in the light most favorable to Infinity establish that Infinity breached the contract at the end of April 2018, when it failed to timely pay for ads printed in earlier months. Infinity has not offered evidence sufficient to support its defense that Inmar breached the contract before Infinity. Therefore, Inmar's motion for summary judgment on its breach of contract claim will be granted in part and denied in part.

Other issues raised by the parties' summary judgment motions will be discussed in turn.

# I.    FACTS

The facts are stated in the light most favorable to Infinity, the non-moving party in relevant part.[1]  They are largely taken from emails between the parties and from the testimony of Laresa McIntyre, Infinity's co-president and CFO, who was the person at Infinity involved in the matters at issue.[2]

In December 2017, Inmar's predecessor[3] and defendant Infinity entered into a contract.  Doc. 65-5.  In the contract, which the parties called an "insertion order," Inmar agreed to arrange to print ads for Infinity's customer, Dish, on receipts for purchases at Dollar General Stores.  *See id.*  Infinity had to provide the artwork for the ads to Inmar, *id.*; Doc. 65-2 at 13 [100–101],[4] and Inmar would then arrange with Dollar General for the ads to be printed on the receipts.  Doc. 65-4 at ¶ 4.  The parties agreed to a minimum

---

[1] On the attorneys' fees issue discussed *infra*, there are cross-motions for summary judgment. On that issue, the facts concern one letter sent by Inmar to Infinity, and its contents are undisputed.  *See* discussion *infra* at 18–19.  Infinity also moves for summary judgment on Inmar's quantum meruit claim, which Inmar agrees should be dismissed.  In line with Infinity's motion, Doc. 76, and the Court's Order, Doc. 78, the Court has not considered any material which has been redacted from Infinity's original sealed response at Doc. 69.

[2] Infinity has objected to the evidence about the negotiations leading up to this contract proffered by Inmar in support of its motion.  Doc. 77 at 23.  While some of those facts may or may not have potential relevance at trial, the Court has not considered them in connection with the pending motion.

[3] Carolina Manufacturing Services was a wholly-owned subsidiary of Inmar, Inc. and the original named plaintiff in this case.  Doc. 13 at ¶ 1.  On December 31, 2018, CMS merged with Collective Bias, Inc. to form Inmar Brand Solutions, Inc.  Doc. 30-1.  Inmar moved to amend the case caption in this case to reflect this merger, Doc. 30, and the Magistrate Judge granted the motion.  Doc. 31.

[4] For clarity, citations to condensed deposition transcripts will cite the page number appended by the CM-ECF system, followed by the internal deposition page number in brackets.

number of printed ads per month, and Infinity agreed to pay Inmar a specific per-thousand-receipts rate. Doc. 65-5 at 2. The contract was to run for eleven months beginning January 26, 2018, but Infinity could cancel on sixty days' notice after six months if it met the stated minimum number of prints. *Id.* There was no provision for early cancellation based on poor sales results. Inmar would bill Infinity monthly on the 15th for the previous month's ads, and Infinity would pay within 30 days. *Id.*

Infinity was dissatisfied with the low number of sales inquiries it was receiving as a result of these ads, Doc. 77-2 at 5 [67], and Ms. McIntyre raised the issue of a price reduction with Inmar's Director of Print Receipts, John von Uffel, Doc. 65-4 at ¶ 1, as early as February 28. Doc. 77-4 at 17 [148]. At some point, she became concerned that the Dish ads were not being printed on the Dollar General receipts in the numbers Inmar had promised. Doc. 77-2 at 5 [67], 7 [102]. Ms. McIntyre called Mr. von Uffel to discuss these issues. Doc. 77-4 at 18 [151]. According to Mr. von Uffel's uncontradicted testimony, Ms. McIntyre said the program wasn't performing to her expectations; that Infinity "couldn't continue;" that she would cancel if there was no price break; and that she had told her art department not to provide Inmar with any finished art. *Id.* Mr. von Uffel did not understand her to cancel the contract at that time, but she threatened to do so unless there were price concessions. *Id.* at 18 [152].

After this conversation, Ms. McIntyre sent Mr. von Uffel an email that said:

As a follow up to our conversation today, please find below the performance of the Dollar General campaign for 2017 when we were with [a previous company that provided the same services Inmar was now providing] and the subsequent performance once Inmar took over. Since all of the parameters under Infinity's control are the same, and the same stores are involved, the only logical conclusion

we can come to is that there is a problem with Inmar's execution. Infinity cannot continue to shoulder significant financial losses. Infinity is willing to continue with the program until July 26th if Inmar is willing to make pricing concessions and offer us a rate of 50% of what we are currently paying (CPM = $1.40). Otherwise, we will have to cancel this campaign effective immediately. Please let me know how you would like to proceed by the end of the week.

Doc. 51 at 2. Ms. McIntyre knew that Infinity was obligated to pay for at least six months and that the contract did not have a provision for early cancellation based on poor sales results. Doc. 65-2 at 15 [163–64].

Mr. von Uffel responded by email on Friday, March 30, 2018, that "[w]e are reviewing your pricing request," that Inmar was considering some "program enhancements," that he would get back to her on Thursday, and that "[u]ntil then, starting Sunday, 4/1, the program stop that you put in place with your team will obviously remain in place. Please confirm that this can work." Doc. 65-11 at 2.

Around this time, in late March 2018, Inmar sent invoices to Infinity for the January (pro rata), February, and March 2018 ads. Doc. 65-6; Doc. 65-7. As Ms. McIntyre promised, Infinity stopped providing artwork for the ads to Inmar, and Inmar could not run ads on the receipts without the approved artwork. *E.g.*, Doc. 65-2 at 16 [171–73]; Doc. 65-4 at ¶ 6. Before the telephone conversation and March 28 email, Infinity had sent artwork for early April, Doc. 77-6; Doc. 77-7, but no ads were printed on any Dollar General receipts in April. Doc. 77-4 at 29 [208].

On April 19, Ms. McIntyre and Jason Hazlewood from Infinity met in person with Mr. von Uffel and Roy Simrell of Inmar in Florida. Doc. 77-2 at 7–8 [105–106]. Mr. von Uffel told Ms. McIntyre that they found no "systems issues" related to the campaign.

Doc. 65-2 at 19 [184], and that Inmar did not agree to the price reduction Ms. McIntyre had proposed in the March 28 email. *Id.* at 21 [190–91]. The parties discussed tests that Inmar could run to figure out why the campaign was not performing as expected. Doc. 77-2 at 17 [185]. However, Ms. McIntyre needed to discuss the matter with Infinity ownership and could not immediately agree. *Id.* at 18 [186].

The parties did not meet again in person, *id.* at 20 [196], but they continued to discuss testing by email. Doc. 65-9; Doc. 65-12. On April 27, Mr. von Uffel reminded Ms. McIntyre that Inmar "stand[s] ready to print under the terms of our agreement!" Doc. 65-12 at 2. In a May 3 email that primarily concerned testing, Mr. von Uffel stated "[p]lease note that these tests are initiatives that are completely separate from our in-place insertion order and its terms." Doc. 65-13 at 2.

On May 7, 2018, Inmar sent Infinity an invoice for April. Doc. 65-8 at 3–4. Infinity had not yet paid the previous invoices. *See* Doc. 65-19 at ¶ 5. Ms. McIntyre objected to the April bill via email to Mr. von Uffel, asserting that Inmar "agreed to pause the campaign," and noting that Inmar did not circulate any advertising for April. Doc. 65-8 at 2. She referenced a meeting of unspecified date and asserted that "[i]t was understood the campaign would pause while this investigation was conducted . . . ." *Id.* She then stated that "Infinity is cancelling the contract with Inmar effective immediately and we do not want to proceed with the tests." *Id.*

Infinity paid the January–March invoices in April 2019 only after this lawsuit was filed. Doc. 65-18. Infinity has never paid the invoice for April, nor has it paid for May, June, or July, when the six-month minimum expired.

## II.    OVERVIEW OF ISSUES AND CONTENTIONS

Inmar contends it is entitled to summary judgment on its breach of contract claim, asserting that Infinity breached the contract at the end of March by anticipatory repudiation, at the end of April by failing to pay past due invoices, and in early May by its unilateral termination of the contract without cause.  It further seeks summary judgment on Infinity's affirmative defenses of prior material breach and lack of standing and on its own claim for attorneys' fees.

Infinity has also filed for summary judgment in its favor on Inmar's claim that it is entitled to attorneys' fees.  Infinity seeks dismissal of Inmar's claim for quantum meruit/unjust enrichment.

## III.    BREACH OF CONTRACT

As the evidence summarized *supra* shows, it is undisputed that the parties entered into a valid contract where Inmar would place ads on Dollar General receipts and Infinity would pay for those ads.  It is also undisputed that Infinity did not timely pay for ads run during the January–March time period and that Infinity did not place the orders required under the remainder of the contract period.  The basic dispute in this case centers on who breached first and when.

### A.  The End of March 2018 Events

Inmar contends Infinity breached the contract at the end of March when Ms. McIntyre emailed Mr. von Uffel and told him she would cancel the insertion order unless Inmar gave a price concession and then refused to provide artwork.  Infinity, on the other hand, asserts that Ms. McIntyre's email merely requested a change of pricing; the parties

never treated the email as a cancellation; and both parties had agreed to a pause of the arrangement under the insertion order.[5]

A party may breach a contract by anticipatory repudiation through a "distinct, unequivocal, and absolute" refusal to perform.[6] *D.G. II, LLC v. Nix*, 211 N.C. App. 332, 338, 712 S.E.2d 335, 340 (2011)[7]; s*ee Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 511, 358 S.E.2d 566, 569 (1987) (noting that "if a party to the contract states that he cannot perform except on some condition which goes outside the terms of his contract then the statement will constitute a repudiation"). "[T]o result in a breach of contract, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration." *D.G. II*, 211 N.C. App. at 338, 712 S.E.2d at 340. Additionally, in order to constitute a breach, the refusal to perform must be "treated as such by the adverse party." *Id.* at 339, 712 S.E.2d at 340. Here, there are material questions of fact as to both aspects of the anticipatory repudiation issue.

The March 28 email from Ms. McIntyre indicated that Infinity was dissatisfied with the results of the Dollar General receipt program and was "willing to continue with

---

[5] Inmar has presented evidence that it complied with the requirements of the contract through March 28, 2018. Doc. 65-4 at ¶ 5. Infinity has presented no evidence to the contrary and has made no argument that Inmar breached the contract before April 1. Doc. 56 at 8.

[6] Infinity accurately notes that the operative complaint alleges Infinity's failure to pay in late April was the breach of contract; it does not mention any anticipatory repudiation; and it does not set forth any facts about the late March events which Inmar now contends constitute an anticipatory repudiation. *See* Doc. 13. But it is clear from the depositions that the parties understood anticipatory repudiation to be at issue in the case. And Inmar's summary judgment brief was filed well before the discovery deadline, so Infinity has not been prejudiced.

[7] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

the program" if Inmar would reduce the contract price by fifty percent. Doc. 65-11 at 5. Simultaneously, Infinity ceased providing Inmar with artwork to run the ads, as the contract required. Doc. 65-4 at ¶ 6. The language of the email coupled with the actual cessation of performance can be interpreted as a "distinct, unequivocal, and absolute" refusal to perform by Infinity, not merely strategic posturing. On the other hand, Ms. McIntyre testified that her email was simply aggressive bargaining, Doc. 65-2 at 17 [175–76], and it followed a conversation between the parties during which options were discussed. The factfinder could conclude that Infinity was simply trying to make a better deal if possible, not refusing to perform.

Whether Inmar treated Infinity's refusal to perform as a breach is also a disputed question of material fact. Even after Ms. McIntyre told Mr. von Uffel that Infinity would not comply with the contract terms requiring Infinity to provide artwork for the ads— which meant that Inmar could not and thus did not print ads on Dollar General receipts in most if not all of April—Mr. von Uffel's follow-up March 30 email response does not characterize either the March 28 email or Ms. McIntyre's decision to stop approving artwork as a termination, repudiation, breach, or cancellation. Doc. 65-11 at 2. And Mr. von Uffel, testifying as a 30(b)(6) witness for Inmar, said that as of March 30, the contract remained in place and Inmar was ready to perform. Doc. 77-4 at 21 [174]. He repeatedly testified that after the late March conversations and emails, he expected the program to continue and to restart. *Id.* at 27 [199], at 28 [203]. Finally following the March 28 email, Inmar offered to provide testing in order to evaluate how performance

could be improved.  Doc. 65-12 at 5–6.  A jury could conclude based on this evidence that Inmar did not treat Infinity's actions as a repudiation of the contract.

There is also a disputed question of material fact as to whether the parties agreed to "pause" their contract obligations at the end of March while they discussed modifying the price and while Inmar investigated whether the required number of ads were being printed on receipts.  *Compare* Doc. 77-2 at 7–8 [104–106], *with* Doc. 77-4 at 29 [207–209].   If the parties mutually agreed to modify the terms of the written contract in this way, any failure by Infinity to place an order in April or to provide artwork would not be a breach.

Ms. McIntyre repeatedly testified that the parties mutually agreed to the program pause.  *See, e.g.*, Doc. 65-2 at 13 [101], 19 [183], 21 [190]; Doc. 77-2 at 7 [104], 8 [109]. While Mr. von Uffel consistently testified to the contrary, saying that the program pause was unilaterally imposed by Ms. McIntyre on behalf of Infinity, *see, e.g.*, Doc. 77-4 at 29 [207–209], he did acknowledge the pause in a March 30 email to Ms. McIntyre.  Doc. 65-11 at 2.  And no ads were run in April at all, even though some artwork had been provided before the late March events, designated for use in the early part of April.  Doc. 77-4 at 13 [132]; Doc. 77-6; Doc. 77-7.[8]

---

[8] Absent the email from Mr. von Uffel and the unclear evidence over the artwork, it is doubtful that Ms. McIntyre's testimony would be sufficient to establish a disputed question of fact as to whether the parties orally modified the written contract, even under a preponderance of the evidence standard.  *See, e.g.*, *Lambe-Young, Inc. v. Cook*, 70 N.C. App. 588, 591, 320 S.E.2d 699, 702 (1984) ("[P]roof of an oral agreement that modifies a written contract should be by clear and convincing evidence.").  She was vague as to the terms of this pause agreement unless she was asked leading questions by Infinity's counsel.  Doc. 77-2 at 29 [256–57].  She was also vague and contradictory on when and how she and Mr. von Uffel reached the purported

These issues of fact make summary judgment inappropriate on the question of whether Infinity materially breached the contract at the end of March and on Infinity's affirmative defense of modification. There are disputed questions of fact as to whether Infinity's threat to cancel absent a price reduction, accompanied by a refusal to provide artwork required under the contract, was a "distinct, unequivocal, and absolute" refusal to perform a material term and, if so, whether Inmar treated this refusal as a breach. There is also disputed evidence as to whether the purported "program pause" was unilaterally imposed by Infinity or whether Inmar agreed to modify the contract.

Because there exist material issues of fact surrounding these events, Inmar's motion for summary judgment is denied as to its claim that the March 28 email and cessation of performance was a repudiation by Infinity. A jury must decide whether Infinity breached a material term of the contract in late March and, if so, what damages flow from that breach.

### B. Failure to Pay

Inmar contends that Infinity breached the contract at the end of April 2018, when the invoices for the January–March ads became past due. Infinity admitted in its answer that Inmar issued the invoices on March 20 for the ads printed on Dollar General receipts

---

agreement. She once said that the agreement "was a mutual thing we came up with during a conversation" with Mr. von Uffel, *id.* at 15 [175], but she also testified twice that she didn't remember having a conversation with Mr. von Uffel during the relevant time. Doc. 65-2 at 17–18 [177–78]; Doc. 77-2 at 29 [255]. Infinity has also relied on deposition testimony of Josh Slater for the proposition that the parties mutually agreed to pause their contract obligations. Doc. 77 at 4. Mr. Slater was Infinity's co-president and Chief Operating Officer at the relevant time. Doc. 65-1 at 3 [10]. However, he did not purport to have any personal knowledge about when and how this agreement was reached. *See* Doc. 77-16 at 5–6 [45–46].

beginning January 26 through March.  Doc. 56 at ¶¶ 21, 23, 24.  Counting from March 30, the date Ms. McIntyre says she received the bills, Doc. 77-2 at 16 [179], Infinity was obligated to pay within 30 days, and Infinity concedes that at the latest, these invoices became due on April 29, 2018.  Doc. 77 at 17.

 The undisputed evidence shows that Infinity did not pay Inmar by that date. Failure to pay at the time required for services actually performed as agreed in a contract is a material breach, nothing else appearing.  *See Morris v. Scenera Research, LLC*, 368 N.C. 857, 867, 788 S.E.2d 154, 161 (2016) (noting that failure to pay an employee a promised bonus was a material breach).

Infinity makes a number of perfunctory arguments in opposition to summary judgment based on its failure to pay.  Doc. 77 at 16–17.  None requires extended discussion.

First, Infinity asserts that the breach was not material because it offered to pay Inmar on a schedule and that time was not of the essence.  *Id.*  But it cites no legal authority for the proposition that a failure to pay money owed for services already rendered when the time comes to pay does not constitute a material breach.  It has pointed to no evidence indicating that Inmar did not consider timely payment to be important, no evidence that Inmar gave any indication it would waive or excuse timely compliance with the payment requirements, and no evidence that Inmar had promised or implied it would continue to perform if it was not paid on time.  Infinity's unilateral proposal to pay on a payment plan was sent on May 4, Doc. 77-14 at 2, after it had

already failed to pay on time, and that unilateral act does not raise a question of fact as to whether the failure to pay was material.

Infinity also asserts as an affirmative defense that Inmar had breached the contract in April by not running any ads, so that Infinity's performance was excused.[9] There is no rational view of the evidence to support the contention that Inmar breached the contract by not running ads in April. Under Infinity's evidence, there was a mutual agreement to pause the contract, so Inmar's failure to run the ads could not be a breach. Under Inmar's evidence, Infinity had repudiated the contract in late March, and Inmar was not required to continue performance in light of this breach. Even if the failure to run ads in April was somehow a material breach, it did not excuse Infinity from paying for the ads that were run before the breach. *See Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co., Ltd.*, No. 1:12CV1146, 2018 WL 4616451, at *12 (M.D.N.C. Sept. 26, 2018) (finding even a prior breach by defendants would not excuse plaintiffs from paying for actual goods provided); *Magic Valley Foods, Inc. v. Sun Valley Potatoes, Inc.*, 10 P.3d 734, 739 (Idaho 2000) (holding that buyer was obligated to pay for delivered goods regardless of insecurity over suspected breach by seller); *CT Chems. (U.S.A.), Inc. v. Vinmar Impex, Inc.*, 613 N.E.2d 159, 163 (N.Y. 1993) (same); *Cherwell-Ralli, Inc. v. Rytman Grain Co., Inc.*, 433 A.2d 984, 986–87 (Conn. 1980) (same).

---

[9] In bilateral contracts, if a party to the contract commits a material breach of the contract, the other party is excused from the obligation to further perform under the contract. *See Lake Mary Ltd. P'ship v. Johnston,* 145 N.C. App. 525, 537, 551 S.E.2d 546, 555 (2001); *Coleman v. Shirlen,* 53 N.C. App. 573, 577–78, 281 S.E.2d 431, 434 (1981).

Infinity also contends that its failure to timely pay for the January–March ads was excused because Inmar breached the contract when it sent a bill for April, even though it had run no ads in April. Doc. 77 at 17. But Infinity has not explained how the mere act of sending an invoice can constitute a breach of contract. Moreover, Inmar sent the bill on May 7, after Infinity had failed to pay on time for the first two months of ads. Finally, even if sending the May bill for April could somehow be considered a breach, it does not excuse Infinity from paying for the services Inmar had previously provided pursuant to the contract and before the May bill was sent. *See* discussion *supra*.

Finally, Infinity contends Inmar cannot prove it has been damaged by the nonpayment because it ultimately paid for the January–March ads in full with interest. Doc. 77 at 17. The elements of a breach of contract claim are the existence of a valid contract and breach of the terms of the contract. *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 472 (N.C. 2019). The plaintiff need not prove actual injury, and proof of the breach entitles the plaintiff to nominal damages, even without proof of actual damages. *Bryan Builders Supply v. Midyette*, 274 N.C. 264, 271, 162 S.E.2d 507, 511–12 (1968). In any event, Infinity has not paid Inmar for Inmar's actual damages resulting from Infinity's failure to order any ads for the time remaining on the contract after Infinity's breach.

Inmar is entitled to summary judgment on its claim that Infinity breached the contract on April 29 when it failed to timely pay for ads run in January through March, as required by the contract, and that this breach was material. Inmar is also entitled to summary judgment on Infinity's Second Affirmative Defense that its failure to pay was

excused by Inmar's prior breach, as there is no evidence from which a rational jury could conclude that Inmar breached the contract before April 29.

Inmar did not move for summary judgment on the amount of its damages. That issue will be presented to the jury.

### C. The May 9 Email

Inmar contends that Infinity breached the contract on May 9, when Ms. McIntyre sent an email unequivocally cancelling the contract. Infinity asserts that it had a right to cancel the insertion order on May 9, because Inmar committed a prior material breach when it invoiced Infinity for ads not run in April, "among other things." Doc. 77 at 18.

Since the undisputed facts show that Infinity was in material breach as of April 29 when it failed to pay and that Inmar had not breached the contract before Infinity's breach, *see* discussion *supra*, it is immaterial whether Infinity "breached again" by sending the May 9 email cancelling the contract. The Court need not reach this issue.

## IV. STANDING

Inmar also moves for summary judgment on Infinity's First Affirmative Defense that Inmar "lacks standing to pursue the claims set forth in the First Amended Complaint because it was not the contracting party." Doc. 56 at 8. Standing is a constitutional concept, which generally confers a right to sue on those who suffer harm. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Infinity's affirmative defense is more accurately characterized as an argument that Inmar is not the entity with which it had a contract, not as an issue of standing. In any event, this argument is without merit for several reasons.

14

First, in response to requests to admit, Infinity admitted "that the ISG Insertion Order was a valid and binding agreement between IBS [plaintiff Inmar Brand Solutions] and ISG [defendant Infinity Sales Group] at the time it was signed." Doc. 65-16 at p. 3 ¶ 1. A matter admitted under Fed. R. Civ. P. 36(b) "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended," which Infinity did not seek here. And Infinity has presented no evidence to contradict or undermine the evidence of a merger between Inmar's predecessor CMS and Inmar. *See infra* note 3; Doc. 30-1; *see also, e.g.*, *In re North Carolina Deed of Trust*, 217 N.C. App. 352, 355–56, 719 S.E.2d 207, 210–11 (2011) (a surviving corporation succeeded by operation of law to a lender's status as holder of a promissory note); *Phillips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 713–14 (M.D.N.C. 2009) (surviving corporation could enforce a non-competition agreement executed by its predecessor).

Based on Infinity's admission and the uncontradicted evidence of a merger between CMS and Inmar, Inmar is entitled to summary judgment in its favor as to Infinity's First Affirmative Defense on standing.

## V.    INMAR'S CLAIM FOR ATTORNEYS' FEES

The insertion order has a provision requiring Infinity to pay Inmar's attorney's fees if "any Inmar invoice is collected by or through an attorney." Doc. 65-5 at 2. The parties have filed cross-motions for summary judgment as to Inmar's claim for attorneys' fees it incurred in collecting the unpaid invoices for the January–March ads.[10]

---

[10] Inmar's motion for summary judgment on entitlement to recover attorneys' fees incurred in obtaining payment is only directed at invoices DPN012627 and DPN01264. Doc. 64 at 16.

In North Carolina, a party can recover attorneys' fees as damages for a breach of contract when two conditions are met. First, the party seeking fees must demonstrate a clear contractual provision granting that right. *Stillwell Enters., Inc. v. Interstate Equip. Co.*, 300 N.C. 286, 289, 266 S.E.2d 812, 814 (1980). Second, there must be a statute explicitly authorizing recovery of attorneys' fees. *Id.*

Here, the contract explicitly provides for recovery of attorneys' fees. The parties agreed, via the insertion order, that "Inmar shall be entitled to recover reasonable attorneys' fees and the cost of collection" in connection with any effort to collect payment on invoices by an attorney. Doc. 65-5 at 2. Inmar sent invoices to Infinity on March 30 for work already completed by Inmar. Doc. 65-6; Doc. 65-7. As noted *supra*, Infinity did not pay those invoices until approximately one year later and only after Inmar filed suit against Infinity over the unpaid amount due. Therefore, the contract allows Inmar to recover its attorneys' fees.

In North Carolina, there is a statute authorizing recovery of attorneys' fees in certain situations and subject to certain requirements. As is relevant here, N.C. Gen. Stat. § 6-21.2 provides that "[o]bligations to pay attorneys' fees" arising out of any "evidence of indebtedness" are "valid and enforceable," N.C. Gen. Stat. § 6-21.2 (2018), if the party seeking attorneys' fees has notified the debtor in writing that the attorneys' fees provision will be enforced if the outstanding balance is not paid within five days. N.C. Gen. Stat. § 6-21.2(5).

Inmar contends that the insertion order is an "evidence of indebtedness," Doc. 64 at 18, and Infinity has not disagreed. *See United States ex rel. SCCB, Inc. v. P. Browne*

*& Assocs., Inc.*, 751 F. Supp. 2d 813, 815 (M.D.N.C. 2010) (finding a construction contract satisfied the meaning of "evidence of indebtedness" because it "recognized a legally enforceable obligation . . . to remit payments . . . as they became due, in exchange for [services]"); *see also GR & S Atl. Beach, LLC v. Hull*, No. 11 CV 5883, 2011 WL 4501912, at *7 (N.C. Super. Ct. Sept. 29, 2011) (listing cases). Rather, Infinity contends that Inmar has failed to satisfy the notice requirement of § 6-21.2.

The notice requirement in N.C. Gen. Stat. § 6-21.2(5) is strictly construed. *In re Shangra-La, Inc.*, 167 F.3d 843, 851 (4th Cir. 1999). "The purpose of G.S. 6-21.2 is to allow the debtor a last chance to pay his outstanding balance and avoid litigation, not to reward the prevailing party . . . ." *In re 375, 757.47*, 240 N.C. App. 505, 516, 771 S.E.2d 800, 808 (2015). A party seeking attorneys' fees "shall . . . notify [the debtor] that the provisions relative to payment of attorneys' fees in addition to the 'outstanding balance' shall be enforced and that [the debtor] has five days from the mailing of such notice to pay the 'outstanding balance' *without* the attorneys' fees." N.C. Gen. Stat. § 6-21.2(5) (emphasis added); *see Davis Lake Cmty. Ass'n, Inc. v. Feldmann*, 138 N.C. App. 292, 297, 530 S.E.2d 865, 869 (2000). "Failure to provide notice will result in the disallowance of attorneys' fees." *In re Parker*, No. 12–03128–8–SWH, 2015 WL 5095948, at *8 (Bankr. E.D.N.C. Aug. 27, 2015).

On July 19, 2018, Inmar sent a letter to Infinity, which stated it "serves as notification of the outstanding indebtedness of Infinity" for $2,173,293.75, "plus past due charges at 1.5% per month, attorneys' fees, and other costs and fees." Doc. 65-17. Inmar attached a copy of the complaint, offered to discuss "possible alternative payment

17

arrangements," and advised that if Inmar did not hear from Infinity by July 26, 2018, then Inmar would serve the complaint on Infinity. *Id.*

Inmar's demand letter did not satisfy the notice requirement of § 6-21.2. It demands "immediate payment in full of the entire balance," but it is not clear whether that means the specified "outstanding indebtedness" of $2,173,293.75 or whether it means that amount "plus . . . attorneys' fees." *Id.* While the letter does offer the possibility to avoid litigation through payment of the indebtedness, it does not put Infinity on notice that it could avoid payment of attorneys' fees by doing so. *See id.* The failure to inform Infinity that it could avoid incurring an obligation to pay attorneys' fees by timely payment is fatal to Inmar's claim.

As Inmar points out, North Carolina case law does not require magic words in a § 6-21.2 notice. But the courts do routinely emphasize the requirement of the statute that a debtor must be given notice that timely payment will avoid triggering the obligation to pay attorneys' fees before they will authorize such fees. *See, e.g.*, *In re 375, 757.47*, 240 N.C. App. at 516, 771 S.E.2d at 808; *Fed. Land Bank of Columbia v. Lieben*, 86 N.C. App. 342, 348, 357 S.E.2d 700, 704 (1987) (giving notice of "intent to seek attorneys' fees unless defendants . . . paid [debt]"). Inmar has not directed the Court's attention to any cases holding that the notice requirement was met by a notice that did not explicitly inform the debtor of the ability to avoid incurring an obligation to pay attorneys' fees.

The notice requirement is strictly construed, and the letter to Infinity did not clearly advise Infinity that it could avoid paying Inmar's attorneys' fees if it paid the outstanding balance. Therefore, Inmar cannot establish that it has met the statutory

requirements to recover attorneys' fees pursuant to a contract. Inmar's motion for summary judgment for attorneys' fees as a result of obtaining payment for invoices DPN012627 and DPN012624 will be denied, and Infinity's motion for partial summary judgment on Inmar's claim for attorneys' fees as a result of obtaining payment for invoices DPN012627 and DPN012624 will be granted.

## VI.   INFINITY'S REQUEST FOR ATTORNEYS' FEES

Inmar moves for summary judgment on Infinity's request for an award of attorneys' fees. Doc. 64 at 21. Conceding that there is neither a statutory nor a contractual basis to warrant such an award, Infinity has withdrawn its claim for attorneys' fees. Doc. 77 at 22. Inmar's motion is granted.

## VII.   QUANTUM MERUIT/UNJUST ENRICHMENT

Infinity moves for summary judgment on Inmar's claim for quantum meruit/unjust enrichment. Doc. 67 at 18. Inmar pled quantum meruit/unjust enrichment as an alternative claim to its breach of contract claim. Doc. 13 at ¶¶ 46–51. Since that time, Infinity has conceded that the insertion order "was a valid and enforceable contract at the time it was executed." Doc. 67 at 17; *see also* Doc. 65-16 at p. 3 ¶ 1. In light of this, Inmar admits that a claim for quantum meruit is not an appropriate remedy, *see Military & Fed. Constr. Co. v. Ace Elec., Inc.*, No. 7:14–CV–23–D, 2015 WL 3953814, at *6 (E.D.N.C. June 29, 2015), and no longer pursues this claim. Doc. 71 at 11–12. Accordingly, the Court grants Infinity's motion for summary judgment on Inmar's claim for quantum meruit/unjust enrichment.

## VIII.  CONCLUSION

The jury will decide whether Infinity breached the contract at the end of March by anticipatory repudiation or whether the parties mutually agreed to temporarily modify the terms of the written contract to excuse Infinity's failure to place an order for ads in April. If Infinity breached at the end of March, Inmar is entitled to damages from that date forward.  If the parties mutually agreed to a pause, Inmar is entitled to damages from April 29, when Infinity breached the contract by failing to pay on time for ads placed in January–March, before the pause agreement.  Infinity's performance was not excused by prior material breach, either in March or April, as there was no prior breach by Inmar; and this defense will not be presented to the jury.  Inmar is entitled to summary judgment on its claim of breach of contract to this extent, and the jury will determine what damages are appropriate from that date forward.

While the insertion order did provide Inmar with a contractual right to collect attorneys' fees for its efforts to collect payment of the unpaid invoices, Inmar's failure to comply with the statutory notice requirements preclude its ability to collect these fees. Therefore, Inmar is not entitled to recover attorneys' fees as damages.

Inmar's quantum meruit/unjust enrichment claim and Infinity's claim for attorneys' fees have been abandoned.  Summary judgment will be entered dismissing these claims.

It is **ORDERED** that:

> 1. The plaintiff's motion for summary judgment, Doc. 63, is **GRANTED** as to
>    its breach of contract claim based on Infinity's April 29 failure to pay for

printed ads run from January through March, as stated herein, and to Infinity's affirmative defense of prior material breach; as to Infinity's standing affirmative defense; and to Infinity's claim to recover attorneys' fees. The plaintiff's motion is **DENIED** as to its breach of contract claim to the extent it is based on Infinity's alleged breach at the end of March, as to which there are disputed questions of material fact, and **DENIED** as to plaintiff's claim for attorneys' fees.

2. The defendant's motion for partial summary judgment, Doc. 66, is **GRANTED,** and Inmar's claim for attorneys' fees based on the two identified invoices and for quantum meruit recovery are **DISMISSED**.

This the 30th day of October, 2019.

_____
UNITED STATES DISTRICT JUDGE